IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EXERGEN CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>WAL-MART STORES INC., S.A.A.T. SYSTEMS APPLICATION OF ADVANCED TECHNOLOGY LTD., DAIWA PRODUCTS, INC. and HANA MICROELECTRONICS CO., LTD.,<br><br>Defendants.<br><br>AND RELATED ACTIONS. | Civil Action No. 01-CV-11306-RCL (consolidated with Civil Action No. 02-CV-10436-RCL) |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR NEW TRIAL**

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

Page #

I.    INTRODUCTION ..................................................................................... 1

II.   DEFENDANTS REQUEST A NEW TRIAL ON ALL ISSUES ....................................... 1

    A.    Prejudicial Conduct By Exergen's Counsel Prevented
        A Fair Trial ............................................................................... 2

          1.    Infringement ................................................................. 4

          2.    Invalidity ..................................................................... 8

          3.    Willfulness .................................................................. 10

          4.    Damages ...................................................................... 12

    B.    Several Legal Errors Prevented A Full And Fair Trial ........................................ 14

          1.    The Admission Of The Indemnity Agreement
               And Insurance Policy Caused Unfair Prejudice
               To Defendants ............................................................... 14

               a.    Admission Of The Evidence Caused
                    Prejudice To Defendants ......................................... 16

               b.    The Limiting Instruction Did Not And
                    Could Not Cure The Prejudice .................................... 17

               c.    Exergen's Unrelenting References To
                    The Indemnity Agreement And The
                    Insurance Policy Warrants A New Trial .......................... 18

          2.    The Allocation Of Defendants' Time To Exergen
               Caused Unfair Prejudice To Defendants ................................. 18

          3.    The Admission Of Mr. Faris's Testimony Caused
               Unfair Prejudice To Defendants ........................................... 20

          4.    The Admission Of Evidence Regarding The
               Absence Of A Written Opinion Of Counsel
               Caused Unfair Prejudice To Defendants ................................. 22

          5.    The Admission Of The Safety 1st Evidence
               Warrants A New Trial ...................................................... 23

# TABLE OF CONTENTS

## (Continued)

Page #

6.  The Exclusion Of Defendants' Inequitable Conduct Claim Warrants A New Trial ....................................... 23

C.  The Verdict Is Against The Weight Of Evidence .................................... 23

D.  The Jury's Verdict Was Excessive ........................................................ 25

   1.  Plaintiff Failed To Provide Any Evidence Of Lost Sales In 2001 .................................................. 26

   2.  The Jury's Verdict Was Based On Speculation ........................................... 28

   3.  Plaintiff's Counsel's Closing Argument Provided Inaccurate And Prejudicial Information ........................................................ 30

E.  A New Trial Is Necessary Due To The Improper Conduct That Affected The Jury ........................................ 31

F.  A New Trial On All Issues Is Necessary If This Court Grants Defendants A New Trial On Any Issue ........................................... 31

III.  DEFENDANTS REQUEST A NEW TRIAL ON SPECIFIC ISSUES ........................................................... 32

# TABLE OF AUTHORITIES

Page #

*A-Cal Copiers, Inc. v. North American Van Lines, Inc.*,
180 F.R.D. 183 (D. Mass. 1998. ) ................................................................2, 31

*Adams Labs., Inc. v. Jacobs Engineering Co.*,
761 F.2d 1218 (7th Cir. 1985) ......................................................................18

*Allied Chemical Corp. v. Daiflon, Inc.*,
449 U.S. 33 (1980) ..........................................................................................1

*Anthony v. G.M.D. Airline Services, Inc.*,
17 F.3d 490 (1st Cir. 1994)....................................................................25, 30

*Bookland of Maine v. Baker, Newman & Noyes, LLC*,
271 F. Supp. 2d 324 (D. Me. 2003)........................................................30, 31

*Brown v. Royalty*,
535 F.2d 1024 (8th Cir. 1976) ........................................................................3

*Bruton v. United States*,
391 U.S. 123 (1968) ......................................................................................17

*City of Cleveland v. Peter Kiewit Sons' Co.*,
624 F.2d 749 (6th Cir. 1980) ...................................................................3, 14

*Conjugal P'ship v. Conjugal P'ship*,
22 F.3d 391 (1st Cir. 1994)......................................................................2, 25

*Cuccarese v. Soloman*,
405 F.2d 866 (2nd Cir. 1969) ......................................................................15

*Curtis Manufacturing Co. v. Plasti-Clip Corp.*,
933 F. Supp. 94 (D.N.H. 1995), *rev'd on other grounds*,
135 F.3d 778 (Fed. Cir. 1998) .....................................................................16

*Daubert v. Merrell Dow Pharm.*,
509 U.S. 579, 113 S. Ct. 2786 (1993) ..........................................................21

*Draper v. Airco, Inc.*,
580 F.2d 91 (3rd Cir. 1978)........................................................................3, 5

*Elliott v. S.D. Warren Co.*,
134 F.3d 1 (1st Cir. 1998)............................................................................15

## TABLE OF AUTHORITIES

### (Continued)

Page #

*Forrestal v. Magendantz*,
    848 F.2d 303 (1st Cir. 1988)..................................................................................3

*Gasoline Prods. Co. v. Champlin Ref. Co.*,
    283 U.S. 494, 51 S. Ct. 513, 75 L. Ed. 1188 (1931).........................................32

*González-Marín v. Equitable Life Assurance Soc.*,
    845 F.2d 1140 (1st Cir. 1988)...............................................................................3

*Grain Processing Corp. v. American Maize-Products Co.*,
    185 F.3d 1341 (Fed. Cir. 1999) ....................................................................26, 29

*IPPV Enters., LLC  v. Echostar Commc'ns Corp.*,
    191 F. Supp. 2d 530 (D. Del. 2002) ...................................................................26

*Jimenez v. Dr. Eduardo Heyliger Seguros Triple S, Inc.*,
    792 F. Supp. 910 (D.P.R. 1992) ...........................................................................1

*Kearns v. Keystone Shipping Co.*,
    863 F.2d 177 (1st Cir. 1988)...........................................................................2, 24

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*,
    383 F.3d 1337 (Fed. Cir. 2004) ..........................................................................22

*Koster v. Trans World Airlines, Inc.*,
    181 F.3d 24 (1st Cir. 1999).................................................................................26

*Laaperi v. Sears, Roebuck & Co.*,
    787 F.2d 726 (1st Cir. 1986)...............................................................................26

*Lama v. Borras*,
    16 F.3d 473 (1st Cir. 1994).................................................................................24

*Lareau v. Page*,
    840 F. Supp. 920 (D. Mass. 1993)................................................................18, 19

*Lataille v. Ponte*,
    754 F.2d 33 (1st Cir. 1985)........................................................................2, 14, 20

*Marchant v. Dayton Tire & Rubber Co.*,
    836 F.2d 695 (1st Cir. 1988)...............................................................................26

# TABLE OF AUTHORITIES

## (Continued)

Page #

*Matosantos,*
 2005 WL 1105197 ................................................................................................ 16

*Oiness v. Walgreen Co.,*
 88 F.3d 1025 (Fed. Cir. 1996) ........................................................................ 26, 28

*Perez-Perez v. Popular Leasing Rental, Inc.,*
 993 F.2d 281 (1st Cir. 1993) ............................................................................... 1

*Polansky v. CNA Insurance Co.,*
 852 F.2d 626 (1st Cir. 1988) ........................................................................... 2, 3

*Pryer v. C.O. 3 Slavic,*
 251 F.3d 448 (3d Cir. 2001) ............................................................................. 32

*Puerto Rico Aqueduct and Sewer Authority v. Constructora LLUCH, Inc.,*
 169 F.3d 68 ......................................................................................................... 1

*Radinsky v. Ellis,*
 167 F.2d 745 (D.C.Cir. 1948) ........................................................................... 15

*Raybestos Prods. Co. v. Younger,*
 54 F.3d 1234 (7th Cir. 1995) ............................................................................ 17

*Rivera Castillo v. Autokirey, Inc.,*
 379 F.3d 4 (1st Cir. 2004) ................................................................................. 32

*Shockley v. Arcan, Inc.,*
 248 F.3d 1349 (Fed. Cir. 2001) ........................................................................ 26

*Shore v. Shore,*
 385 Mass. 529 (1982) ....................................................................................... 32

*Stehura v. Short (1974),*
 39 Ohio App. 2d 68, 315 N.E.2d 492 ............................................................... 14

*Unisplay S.A. v. American Elec. Sign. Co.,*
 69 F.3d 512 (Fed. Cir. 1995) ............................................................................ 26

*Vega. v. Evans,*
 128 Ohio St. 535, 191 N.E. 757 (1934) ........................................................... 15

# TABLE OF AUTHORITIES

## (Continued)

Page #

*Warner v. Rossignol,*
   538 F.2d 910 (1st Cir. 1976)..............................................................................31

*White v. Standard Oil Co.,*
   116 Ohio App. 212, 187 N.E.2d 504 (1962) ......................................................15

*Winn v. Lafayette Town House,*
   839 F.2d 835 (1st Cir. 1988)..............................................................................14

## OTHER AUTHORITIES

35 U.S.C. § 271 ................................................................................................13, 29

Fed. R. Civ. P. 59 ....................................................................................................1

Fed. R. Civ. P. 9....................................................................................................23

Fed. R. Evid..........................................................................................................21

Pursuant to Federal Rule of Civil Procedure 59(a), Defendants S.A.A.T. Systems Application of Advance Technology Ltd. ("SAAT"), Daiwa Products, Inc. ("Daiwa"), and CVS Corp. ("CVS") (collectively, "Defendants"), submit this memorandum in support of Defendants' Motion for a New Trial.

## I. INTRODUCTION

Rule 59 gives this Court the power to correct "a broad panoply of errors in order to prevent injustice." *Perez-Perez v. Popular Leasing Rental, Inc.*, 993 F.2d 281, 283 (1st Cir. 1993); *see also Puerto Rico Aqueduct & Sewer Authority v. Constructora Lluch, Inc.*, 169 F.3d 68, 77; 11 Charles Alan Wright et al., *Federal Practice and Procedure* § 2803 (2d ed. 1995). It is this Court's duty to order a new trial if it is within the interest of justice, as it is in this case. *See, e.g., Jimenez v. Heyliger*, 792 F. Supp. 910, 914 (D.P.R. 1992); Wright, *supra*, § 2803. As set forth in detail below, prejudicial error began to permeate this case during the first week of trial and continued through Plaintiff's closing statement. This extreme prejudice to Defendants was finally evidenced by the jury's unsupported and speculative verdict. Accordingly, to restore Defendants' right to a fair trial, Defendants request that this Court grant a new trial on all issues.

## II. DEFENDANTS REQUEST A NEW TRIAL ON ALL ISSUES

A new trial may be granted "in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States . . . ." Fed. R. Civ. P. 59(a). Whether to grant a motion for a new trial lies within the discretion of this Court. *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980). The record in this case provides ample bases on which this Court may grant Defendants a new trial. First, a new trial is warranted based on the improper behavior of Plaintiff's counsel. *See Polansky v. CNA Insurance Co.*, 852 F.2d 626, 628 (1st Cir. 1988) (holding that trial errors

caused by misconduct of the defendant's attorney entitled plaintiff to a new trial).     Second, a new trial is warranted to correct legal errors. *See, e.g., Lataille v. Ponte*, 754 F.2d 33, 38 (1st Cir. 1985) (granting new trial after finding prejudicial error in the admission of certain evidence during trial).     Third, a new trial is warranted because the jury's verdict is against the clear or great weight of the credible evidence. *Kearns v. Keystone Shipping Co.*, 863 F.2d 177, 181 (1st Cir. 1988) (affirming grant of new trial since in light of the evidence and testimony, the verdict constituted a gross miscarriage of justice).     Fourth, a new trial is warranted because the damages awarded by the jury were excessive. *Conjugal P'ship v. Conjugal P'Ship*, 22 F.3d 391, 397 (1st Cir. 1994) (affirming district court's finding that jury's damages verdict was infested with errors).  Fifth, a new trial should be granted because the improper conduct at trial negatively affected the jury. *A-Cal Copiers, Inc. v. North American Van Lines, Inc.*, 180 F.R.D. 183, 188 (D. Mass. 1998.)  Thus, in light of the overwhelming abundance of  prejudicial error, Defendants urge this Court to grant a new trial.

**A.**     **Prejudicial Conduct By Exergen's Counsel Prevented A Fair Trial**

A new trial is warranted based on the improper behavior of Plaintiff's counsel. *Polansky*, 852 F.2d at 628.  During trial, Plaintiff Exergen Corporation ("Exergen" or "Plaintiff") zealously questioned several of Defendants' witnesses about indemnity insurance.  Then during closing argument, Exergen made statements in blatant disregard of the Court's claim construction, concocted fabrications devoid of any connection to actual evidence, and grossly mischaracterized the evidence of record. These repeated misrepresentations misled the jury as to important facts and severely prejudiced Defendants.

In assessing the effect of Plaintiff's counsel's improper conduct, the Court must examine the totality of the circumstances, including the nature of the comments, their frequency, their

possible relevancy to the issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case, and the verdict itself.  *See Forrestal v. Magendantz*, 848 F.2d 303, 309 (1st Cir. 1988) (quoting *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir. 1980)).   Plaintiff's conduct must also be prejudicial. *See González-Marín v. Equitable Life Assurance Soc.*, 845 F.2d 1140, 1147 (1st Cir. 1988).

Notably, prejudicial remarks during closing arguments call for a new trial, despite a curative instruction.  *Draper v. Airco, Inc.*, 580 F.2d 91, 94-97 (3d Cir. 1978).  In *Draper*, the court granted a new trial based on a closing argument that included repeated inappropriate references to defendant's wealth, counsel's personal opinions regarding the justness of his client's cause, prejudicial references to facts not in evidence and prejudicial references to opposing counsel.  *Id.*  Also, courts have long recognized that statements of counsel's opinions or personal beliefs have no place in a closing argument.  *Polansky v. CNA Insurance Co.*, 852 F.2d 626, 628 (1st Cir. 1988).  It is error not to correct counsel's statements regarding personal beliefs and opinions by giving a timely curative instruction directed particularly to counsel's comments.  *Id.*  Indeed, "a blanket instruction from the court that argument of counsel is not evidence will not rectify" the prejudice done.  *Id.* (citation omitted).  Finally, a new trial is warranted where counsel deliberately made references to facts despite the court's ruling that such facts were inadmissible.  *Brown v. Royalty*, 535 F.2d 1024, 1028-29 (8th Cir. 1976).

Here, Exergen's closing statement greatly exceeded the boundaries of what is permissible at trial.  A discussion of Exergen's relentless questioning regarding indemnity insurance is discussed below in Section B.1.  Exergen's fabrications during closing statement relating infringement, willfulness, damages, and invalidity are as follows.

1.    **Infringement**

In an attempt to bolster its failing infringement argument, Exergen resorted to fabrications to persuade the jury. Not only are such fabrications improper, but they also evidence the many holes in Plaintiff's infringement case.

In an attempt to prove that Defendants infringed in connection with the Safety 1st device, Exergen had to show at trial that Defendants, through the Safety 1st instructions, instructed users to use the Safety 1st device in accordance with the claimed method. Exergen provided no evidence that anyone—let alone the Defendants—had ever published or distributed the Safety 1st brochure. The only testimony at trial was that Defendants had not prepared, approved, or seen the Safety 1st packaging prior to trial. (06-29-05 Trial Tr. 74:17-76:16.)[1] Exergen never rebutted or impeached that testimony. Facing this lack of evidence at the end of trial, Exergen tried to create evidence from thin air, telling the jury that it could, "take the absence of [testimony from Safety 1st's representative] from this trial as evidence that, if he came here, he would have said, SAAT did it." (07-07-05 Trial Tr. 118:5-8.) Of course, Plaintiff cannot rely on the absence of evidence to prove infringement – it was *Plaintiff's* burden to show infringement. Exergen went on to create testimony from Safety 1st, claiming that Mr. Macari knew nothing about how the accused product worked (*id.* at 118:8-9), that "[o]ne thing we know for sure is Safety 1st didn't get an opinion that it thought was sufficient to go forward with the product" (*id.* at 123:4-6). Given that no one from Safety 1st testified at trial, there is no support for any of those statements in the record. In particular, there is no evidence as to how much information

---

[1] All excerpts from the trial transcript and the trial exhibits cited in this memorandum are attached to the Decl. of Amy C. Christensen in Support of Defs.' Motion for New Trial ("Christensen Decl.").

Mr. Macari knew about how the accused product works, nor is there any evidence about any opinions received by Safety 1st. Exergen then stated that the Safety 1st product was being manufactured. (*Id.* at 123:12.) There was no such testimony from Safety 1st, or any other witness. Moreover, Mr. Gerlitz, CEO of Defendant SAAT, testified that, to the contrary, only a few samples were created, but that no other forehead thermometers were made for Safety 1st. (06-30-05 Trial Tr. 70:19-11.) Exergen's tall tales about Safety 1st have no basis in the record and were manifestly improper.

Next, in blatant disregard of the Court's instructions and the law, Exergen repeatedly urged the jury to ignore the Court's claim construction as to the internal temperature. (*See, e.g.* .07-07-05 Trial Tr. 119:18-22, 120:11-14, 125: 24-25, 126:16-18, 127:5-9, 137:10-13, 143:23-25.) Exergen even dared taunt the Court and the jury by claiming, "Mr. Gerliz is the only person in the world who thinks oral temperature is not an internal temperature." (*Id.* at 119:18-20.) Exergen knew that this conduct was not proper given that the previous day, Exergen attempted to question Defendants' expert about a definition of "internal temperature" different from that of the Court, and the Court prohibited Plaintiff from doing so. (07-06-05 Trial Tr. 86:12-22.) The Court recognized this improper conduct and attempted to correct the error through a corrective instruction, (07-07-05 Trial Tr. at 168:17-169:7), but Exergen's remarks were highly prejudicial and were not curable by the curative instruction. *See, e.g., Draper*, 580 F.2d at 94-97.

As if that were not enough, Exergen then went on to create a false story about the creation of SAAT's forehead thermometer. First, Exergen falsely characterized SAAT's ear thermometer as looking at one spot and that in developing the forehead thermometer, Mr. Gerlitz was changing the SAAT ear thermometer to something that could not look at one spot.

(07-07-05 Trial Tr. 121:17-19.)  Nothing in the record supports this mischaracterization. Exergen then went on to create evidence of copying by claiming that Mr. Gerlitz had the Philips product (which presumably measured the temperature of the temporal artery) so that during development of the forehead thermometer, Mr. Gerlitz knew he was looking for the temporal artery. (*Id.* at 121:19-23.)  Again, this statement is completely false. Mr. Gerlitz testified that it was another person from SAAT who saw the Philips product at the MEDICA show and that Mr. Gerlitz did not recall ever seeing the Philips product. (06-29-05 Trial Tr. 67:6-16.)  Thus, there was *no* testimony that Mr. Gerlitz ever had the Philips product or that Mr. Gerlitz' was copying it and looking for the temporal artery.

Exergen then distorted the testimony regarding SAAT's FDA submission by falsely stating that Mr. Gerlitz told the FDA that the measurement of the temporal artery was the rationale for using the SAAT thermometer. (07-07-05 Trial Tr. 122:15-17.)  As set forth by SAAT's FDA file, in a letter dated November 9, 2001, the FDA requested "valid, scientific and clinical background material that supports [SAAT's] contention that accurate measurements of body temperature can be taken from the forehead." (Trial Ex. 61 at EXE041652-53.)  SAAT then provided "background material" showing that SAAT was not the only company using the forehead as a measurement site. (*Id.* at EXE041563-67.)  There is nothing in SAAT's FDA submission showing that the SAAT thermometer works the same as or measures the temporal artery like the Exergen thermometer.  To the contrary, SAAT's FDA submission repeatedly stated that the SAAT thermometer provides oral temperature (*see, e.g.*, Trial Ex. 61 at EXE041566, EXE41695, EXE41708), and SAAT never claimed that it measures the temperature of the temporal artery.  Nonetheless, Exergen blatantly stated that the accused product "computes the temperature of the temporal artery." (07-07-05 Trial Tr. 125:16-17.)

Unable to find support in the record, Exergen then resorted to mischaracterizing the practices of the entire industry. Exergen stated that an industry standard document ("ASTM document") supported the validity of the testing performed by Dr. Pompei. Exergen urged the jury to believe that because Dr. Pompei's experiment used of a device known as a "blackbody," which was referenced in the ASTM document, the experiment was valid. (07-07-05 Trial Tr. 127:12-24.)    The ASTM document, (Trial Ex. 3002), simply stated, however, that a blackbody should be used to determine the "laboratory accuracy" of a thermometer. (*Id.* at 4). The ASTM document provided no support whatsoever for the assertion that Dr. Pompei's experiment could determine whether Defendants' thermometers obtained a peak temperature signal. Exergen never dared to elicit any evidence from any witness to support this statement. Any witness questioned would have admitted that the ASTM document had no relevance to Dr. Pompei's experiment. Indeed, Dr. Pompei himself admitted that his experiment could not determine whether Defendants' thermometers discarded the peak radiation measurement. (06-17-05 Trial Tr. 16:16-17:1.)

Exergen also falsely stated that the ASTM document "says you can't use skin surface temperature measurements to detect internal body temperature." (07-07-05 Trial Tr. 135:5-7.) As set forth during Mr. Goldberg's testimony, however, this statement is incorrect. The ASTM document states that "skin temperature cannot be *independently* correlated with internal body temperature." (Trial Ex. 3002 (emphasis added).)  Mr. Goldberg explained that the ASTM document explained that internal temperature depends on blood profusion and environmental conditions such that skin temperature could be correlated with internal temperature by using other information – information that Dr. Pompei relied upon for his calculations. (07-06-05 Trial Tr. 87:18-89:2.)

As a final effort to resurrect its failing argument, Exergen misrepresented the contents of SAAT's Israeli patent application. Exergen claimed that the Israeli patent application (Trial Ex. 1128) showed that Defendants' thermometers obtain the peak temperature signal. (07-07-05 Trial Tr. 140:6-24.) In support of this argument, Exergen pointed to a Fig. 5B of the application and claimed that the figure showed that accused devices measured peak. (*Id.* at 140:6-24, 141:1-142:7.) Exergen's argument was blatantly false. As the text of the application plainly described, Fig. 5B only illustrated "the nature of temperature measurement ***within the ear canal*. . . .**" (Trial Ex. 1128 at 8 (emphasis added).) No evidence whatsoever supported Exergen's representation that Fig. 5B had any relevance to the accused forehead thermometers, and Exergen never dared attempt during trial to elicit any evidence about Fig. 5B from any witness. Had Exergen done so, any witness would have readily admitted that the text of the patent application showed that Fig. 5B has no relevance whatsoever to the accused forehead thermometers.

## 2. Invalidity

When faced with Defendants' invalidity arguments, Exergen recognized the need to further bolster Plaintiff's case through additional misrepresentations. Exergen discussed the Tessal reference and stated that Defendants "put this thing up here and they picked little pieces out of it." (07-07-05 Trial Tr. 132:20-21.) Defendants, however, never discussed the Tessal reference. Defendants admitted the Tessal reference into evidence and asked Dr. Pompei if he recognized the document. (06-17-05 Trial Tr. 99:20-100:14.) Dr. Pompei stated that he did not, so Defendants did not ask Dr. Pompei any questions regarding the reference. (*Id.*) The Tessal reference was never discussed again until Plaintiff's closing statement. Accordingly, the statement that Defendants "picked little pieces out of it" is just false.

Next, Exergen stated that with respect to U.S. Patent No. 3,781,837 to Anderson, ("the Anderson patent"), it was "supposed to teach the temporal artery." (07-07-05 Trial Tr. 133:2-3.) Defendants only discussed the Anderson patent with respect to Claim 7 of U.S. Patent No. 5,012,813 ("the '813 patent"). (07-06-05 Trial Tr. 7:12-16:11.) Claim 7 does not even reference the temporal artery. (Trial Ex. 10.) Once again, Exergen was incorrect.

Exergen then falsely stated that U.S. Patent No. 5,293,877 to O'Hara ("the '877 patent") stated that Mr. O'Hara's own prior device had been a commercial flop. (07-07-05 Trial Tr. 136:2-5.) There was no such statement in the '877 patent as set forth by the patent itself, (Trial Ex. 1700), as well as the testimony of Defendants' technical expert, Mr. Goldberg. (07-06-05 Trial Tr. 96:4-23.) Exergen then goes on to inaccurately state that Mr. Goldberg said "it's not a practical device, and it had been scrapped for something new." (07-07-05 Trial Tr. 136:6-7.) To the contrary, Mr. Goldberg testified that the device was a "big hit" and "a very important event." (07-06-05 Trial Tr. 96:7-23.) When asked whether the device "turned out not to be practical," Mr. Goldberg's answer was that he did not agree. (*Id.*)

To attempt to refute Defendants' claims of lack of enablement and best mode as to Claim 7, Plaintiff falsely stated that there is no one value for $K_c$, that there are many of them, and that it "depends on the thermal resistance of your body, and everyone is a little different." (07-07-05 Trial Tr. 137:19-21.) Dr. Pompei testified to the contrary, admitting that that $K_c$ is "*a* number" and that, "[f]or a certain location in the body, you know, if you did it right, you chose location, built the product correctly, it will be the same number," namely the same number for "all environmental temperature chamber temperatures." (06-14-05 Trial Tr. 141:5-11.) As Dr. Pompei further testified, "It does not change." (06-14-05 Trial Tr. 141:20-22.)

3.    **Willfulness**

Exergen further created a fantasy story about willfulness.  As set forth in Defendants'
Mem. in Support of  its JMOL of No Willful Infringement, in its closing argument, Exergen
walked the jury through outrageously damning testimony about willful infringement, including
shocking conversations between SAAT and its counsel about how to get away with willful
infringement and a nefarious plot by CVS to find out whether Exergen had the financial
capability to litigate its patents.  However, this damning testimony was never given at trial – or
anywhere else.  Exergen, having no actual evidence of willful infringement, simply invented
inflammatory evidence and falsely asserted to the jury that this non-existent evidence was
actually presented during trial. This is not a case of mere mischaracterization or exaggeration,
but instead is a case of outright fabrication.

For example, Exergen advised the jury that the Defendants could not reasonably rely
upon Mr. Jensen's legal analysis because Mr. Jensen's letter states, "We haven't read the
specifications.  We haven't read the claims."  (07-07-05 Trial Tr. 143:22-23.)   However,
Mr. Jensen's letter does not even remotely suggest that he failed to read the specification or
claims of any patent.  Nor was there any other evidence of such an abject failure.  To the
contrary, for each patent discussed, Mr. Jensen's letter itself refers to specific claim limitations
that he concluded were not present in SAAT's device, obvious confirmation that he read the
claims.   (Trial Ex. 1149.)   In addition, the testimony was unequivocal that Mr. Jensen
specifically discussed the claims of the '813 and '205 patents with Mr. Gerlitz.  (06-30-05 Trial
Tr. 86:8-21, 87:6-15.)

Exergen next invented conspiratorial conversations between SAAT and its counsel.
Exergen referred the jury to "those discussions that happened that aren't written down."

-10-

(07-07-05 Trial Tr. 145:16-17.)   Exergen informed the jury that "those discussions that were happening in 2001 were not discussions that said you are all clear on the '205 patent." (*Id*. at 145:18-20.)   Rather, according to Exergen, Mr. Jensen told his client, "whatever you do, don't ask me about '205 because I'm stuck." (*Id*. at 145:20-21.)   According to Exergen, SAAT knew it was infringing the '205 patent, "and they couldn't figure out how they were going to get an attorney to tell them otherwise," (*id*. at 144:23-24), so SAAT and Mr. Jensen agreed to deliberately omit the '205 patent from Mr. Jensen's letter, (*id*. at 144:14-146:10).

This was a frightening tale of abuse of the legal system.   But it was a complete fabrication, unsupported by any evidence.   There simply was no evidence of the conversations invented by Exergen in closing argument.   To the contrary, the evidence was unequivocal that, in all the discussions between Mr. Jensen and the Defendants, Mr. Jensen was emphatic that the Defendants did not infringe the '205 patent.   (06-30-05 Trial Tr. 86:8-87:15, *see also id*. at 22:4-8, 23:2-12.)

Exergen also fabricated facts as to Safety 1st's review of the opinion letters claiming that "Safety 1st patent lawyer ... said not good enough and they cancelled." (07-07-05 Trial Tr. at 146:12-13.)   There was absolutely no evidence in the record as to what Safety 1st's patent lawyer thought of the opinion letters.

Next, Exergen informed the jury that CVS obtained information about Exergen's financial condition as part of a secret plot to learn if Exergen had the financial strength to file a patent suit.   Exergen told the jury: "They were just trying to get some competitive information from them and find out, is Exergen still in such financial trouble that they couldn't possibly start litigation against us so we can run for luck on this one." (07-07-05 Trial Tr. 148:5-9.)   Again, there was no evidence to support the existence of this nefarious scheme.   In fact, there was not

even any evidence that CVS requested or received any information about Exergen's financial condition. To the contrary, Arthur Marandola of CVS testified extensively about his meeting with Exergen, and explained repeatedly that they discussed only the features of the Exergen thermometer and how much Exergen would charge CVS for it. (06-17-05 Trial Tr. 133:1-144:5.) Moreover, Mr. Marandola testified explicitly that he did not know what resources Exergen had. (*Id.* at 162:13-15.) Certainly, there was no evidence whatsoever of a plan by CVS to use false pretenses to obtain confidential information about Exergen's financial condition or to use this information as a basis for deciding whether to infringe Exergen's patents.

4.    **Damages**

During closing, Exergen admitted that there had been "some difficulties" with the damages calculation in this case. (07-07-05 Trial Tr. 148:10-12.) After that, however, Exergen's closing departed far and wide from the record.

First, Exergen recognized that there were problems with its calculation of overhead and improperly attempted to "fill in the record" with Exergen's counsel's own calculations. (*Id.* at 149:3-15.) At the time, the Court recognized that the calculation was not evidence and emphasized to the jury that counsel is not permitted to create evidence. (*Id.* at 169:8-23.)

Next, Exergen claimed that its damages expert, Mr. Faris, did not know the number of units *until he heard Mr. Nyman testify,* and so he did not have that information when he calculated overhead. (*Id.* at 149:16-150:1.) On June 10, 2005, the Friday before the first day of trial, Plaintiff sent to Defendants an update to Mr. Faris's expert report providing a calculation of lost profits using the total number of units, *signed by Mr. Faris and dated June 9, 2005.* (*See* Christensen Decl. Ex. A ("Letter from Christopher Centurelli to Michael K. Friedland dated June 10, 2005").) Thus, at least as early as June 9, 2005, Mr. Faris knew the number of units.

Exergen's statement during closing was completely false. The letter also included "corrections" to Mr. Faris's calculation of labor and incremental profit. (*See id.*) There was no reason why Mr. Faris could not have also corrected his overhead number, especially given that it was clear that before trial even began, he knew the total number of units.

Third, Exergen stated that, "there is no question that every sale Daiwa made in 2001 was a sale that Exergen lost" (07-07-05 Trial Tr. 150:22-23), and that, "if Daiwa had not been there, Exergen could have made the sales to Eckert, Albertson's, Wal-Mart, CVS." (*id.* at 151:6-7), yet there is no such supporting evidence in the record. In 2001, the only sales Plaintiff made were to Babies-R-Us. (06-15-05 Trial Tr. 94:24-95:2.) Moreover, Exergen admitted during closing that in 2001, Plaintiff "had absolutely no money" and that "they'd lost their source of manufacturing output." (07-07-05 Trial Tr. 148:12-18.) Exergen also knew that it could not get lost profits for any sales made by Defendants before July 12, 2001 since Exergen's product was not approved by the FDA until July 12, 2001, (Trial Ex. 2604), and that Exergen would not have shipped any of those products until it had received FDA approval. (06-29-05 Trial Tr. 42:21-22.)

Fourth, Exergen stated that CVS caused Plaintiff to lose sales of 17,000. (07-07-05 Trial Tr. 151:8-9.) Exergen knew, however, that the 17,088 number represented the number of units CVS *purchased* in 2001, and not the number of units CVS *sold* in 2001. Since a party is not liable for purchasing units, 35 U.S.C. § 271, Exergen's references to the 17,088 number were utterly false and meant only to be misleading.

Exergen's closing statement as to infringement, willfulness, invalidity, and damages with riddled false and misleading statements that could have only lead to prejudicing the minds of the jurors.

Defendants had no opportunity to respond during closing statement before the jury. Accordingly, the last things the jury heard before deliberations was Plaintiff's fictional account. Thus, the improper behavior of Plaintiff's counsel was highly prejudicial to Defendants and compels the grant of a new trial.

**B.    Several Legal Errors Prevented A Full And Fair Trial**

A new trial should also be granted to correct legal errors. *See, e.g., Lataille*, 754 F.2d at 38. This Court made several rulings that had a profound effect on this trial. Now that this Court has seen the evidence and how Exergen exploited these rulings to the prejudice of Defendants, this Court should correct the errors in its earlier rulings and grant a new trial on all issues.

**1.    The Admission Of The Indemnity Agreement And Insurance Policy Caused Unfair Prejudice To Defendants**

New trials are specifically warranted to remedy improper questioning of witnesses. *See Winn v. Lafayette Town House*, 839 F.2d 835 (1st Cir. 1988). In particular, it is "prejudicial error" to allow counsel to inject into trial the idea that the defendant "had insurance which would cover any damages the defendant would be obliged to pay." *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 758 (6th Cir. 1980). The *City of Cleveland* court stated:

Indeed, "the impropriety of surreptitiously giving to the jury in negligence actions the idea that a verdict for the plaintiff will, in the last instance, fall upon a liability insurance company rather than upon the nominal defendant is widely recognized." 53 Ohio Jur.2d Section 270, p. 187. "Knowledge of defendant's insurance has traditionally been treated as fruit of the forbidden tree." *Stehura v. Short* (1974) 39 Ohio App.2d 68, 70, 315 N.E.2d 492. Without question, "a trial lawyer is

treading on dangerous ground and always approaches grounds for a mistrial by the mere mention of insurance when same is not at issue." *White v. Standard Oil Co.*, 116 Ohio App. 212, 220, 187 N.E.2d 504, 509 (Court of Appeals for Marion County, 1962). *See also Vega v. Evans*, 128 Ohio St. 535, 191 N.E. 757 (1934).

* * *

Instead, here, the subject of insurance coverage for defendant in this action was pointedly, unambiguously, repeatedly, and "deliberately brought out by counsel," *Smith, supra*, for the City. "The general principle that the voluntary or intentional introduction into evidence, either directly or indirectly, by the plaintiff of the fact that a defendant in a tort action is protected by liability insurance, is prejudicial error and grounds for a mistrial, is . . . well settled." *Gleaton, supra*. As the Court in *Radinsky v. Ellis*, 167 F.2d 745, 746 (D.C.Cir.1948), stated:

> In a case such as this, when the existence of insurance protection in favor of the defendant is shown to the jury, a mistrial should be declared forthwith.

*Id.* (granting a new trial despite sustaining objections and admonishing the jury). *See also Cuccarese v. Soloman*, 405 F.2d 866 (2d Cir. 1969) (granting a new trial where plaintiff's counsel implied that defendant had liability insurance to cover a judgment).

Courts may invoke Rule 411 to preclude the use of various types of insurance, such as insurance policies and in particular indemnity agreements or provisions. *Elliott v. S.D. Warren Co.*, 134 F.3d 1 (1st Cir. 1998) (concluding that "the district court acted within its authority in limiting the use to which the [construction] contract [with indemnification and insurance provisions] could be put"); *Curtis Manufacturing Co. v. Plasti-Clip Corp.*, 933 F. Supp. 94,

-15-

100-101 (D.N.H. 1995), *rev'd on other grounds* 135 F.3d 778 (Fed. Cir. 1998) (barring evidence of indemnification agreement between defendants); *Matosantos*, 2005 WL 1105197, at *4 (holding that the rationale behind Rule 411 is "best served by suppressing at trial evidence of the indemnity agreement"); *Garmac*, 932 F.2d at 1570 (finding that the fidelity bond was insurance such that references to the bond was exactly "the kind of prejudice Rule 411 was intended to eliminate").

During the trial, Exergen repeatedly presented the jury with evidence regarding the insurance policy and indemnity agreement.[2]  The Court then decided that the evidence of the indemnity agreement and the insurance policy should not have been admitted and instructed the jury that such evidence was stricken from the record and that it should be disregarded. (07-08-05 Trial Tr. 40:10-24.)

### a.    <u>Admission Of The Evidence Caused Prejudice To Defendants</u>

Once the evidence of the indemnification agreement and insurance policy was admitted, Exergen repeatedly emphasized that evidence.  During the examination of one of the CVS witnesses, Mr. Sullivan, Exergen asked numerous questions regarding the indemnity agreement. (*See, e.g.,* 06-17-05 Trial Tr. 171: 16-17; *id.* at 175: 21-25; id. at 176: 22-23; *id.* at 176:25-177:3; *id.,* at 177: 6-15; *id.* at 177:19-22.)   Exergen continued the same line of questioning with a witness for Daiwa, Mr. Nyman.  (*See, e.g.,* 06-23-05 Trial Tr. 44:21; *id.* at 44:23-25; 06-24-05 Trial Tr. 27:13-15; *id.* at 29:13-14; *id.* at 31:12-15; *id.* at 31:21-24; *id.* at 57:5-7; *id.* at 57:9; *id.* at 57:19-22;     *id.* at 58:6-8; *id.* at 58:9-10;     *id.* at 58:12-19;     *id.* at 60-4-14;

---

[2] Defendants' objected to the admission of the evidence, but Defendants' objection was overruled. (*See, e.g.,* 06-17-05 Trial Tr. 173-175.)

*id.* at 60:21.)[3]  Exergen's questions regarding the indemnity agreement and insurance policy were not meant to show Defendants' beliefs as to invalidity and non-infringement of the patents, but instead to imply that because Defendants had insurance, they were likely to have willfully infringed – use expressly prohibited by Rule 411 as acknowledged by this Court.  Accordingly, Exergen's relentless references to insurance caused great prejudice to Defendants.

b.    **The Limiting Instruction Did Not And Could Not Cure The Prejudice**

To attempt to remedy the admission of the indemnity agreement and insurance policy, the Court issued the a limiting instruction.[4]  (07-08-05 Trial Tr. 40:10-24.)  As set forth below, however, the limiting instruction was unable to remedy the prejudice to Defendants.

In many circumstances, the jury can and will follow the court's instructions.  *See Bruton v. United States*, 391 U.S. 123, 135 (1968).  However, "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."  *Id.*  Thus, the court may presume that the jury will follow an instruction to disregard inadmissible evidence, "unless there is an overwhelming probability that the jury will be unable to follow the court's instructions and a strong likelihood that the effect of the evidence would be devastating.'"  *Raybestos Prods. Co. v. Younger*, 54 F.3d 1234, 1239 (7th Cir. 1995).

---

[3] A chart showing the unrelenting questioning by Plaintiff's counsel is set forth in Christensen Decl. Ex. B.

[4] During trial, Defendants' objected to the limiting instruction stating that it would not cure the problem and again raised the same objection after the corrective instruction was read to the jury.  (*See* 06-24-05 Trial Tr. 143:1-12; 07-08-05 Trial Tr. 41:21-24.)

As set forth above, Exergen's pervasive questioning regarding the indemnity agreement and the insurance policy made it impossible for the jury to follow the Court's limiting instruction to ignore the insurance evidence.  Moreover, the limited instruction was given 20 days after the Exergen's first line of questioning as to this evidence – well after the jury's view of Defendants' case was already tainted.

      c.      **Exergen's Unrelenting References To The Indemnity Agreement And The Insurance Policy Warrants A New Trial**

The introduction of this evidence warrants a new trial since the prejudice to Defendants cannot be cured by a limiting instruction.  Unlike cases where there was an indirect or one-time reference to insurance, in this case, Exergen's repeated references to the indemnity agreement and the insurance policy make the admission of the insurance incurable.  References to insurance may constitute reversible error if there is "some misconduct or improper remarks or questions of counsel, ofttimes repeated, and calculated to influence or prejudice the jury."  *See e.g., Adams Labs., Inc. v. Jacobs Engineering Co.*, 761 F.2d 1218, 1226-27 (7th Cir. 1985).  Here, where the references were numerous and unrelenting, the cumulative effect surely warrants a new trial.  *Id.* at 1227.

Accordingly, Defendants request a new trial on all issues due to the prejudicial use of the improperly admitted insurance evidence.

      **2.**      **The Allocation Of Defendants' Time To Exergen Caused Unfair Prejudice To Defendants**

"District courts may impose reasonable time limits on the presentation of evidence."  *Lareau v. Page*, 840 F. Supp. 920, 933 (D. Mass. 1993).  This allows each party "to allocate time as that party chooses among different uses *as long as its total allotment is not exceeded.*"

*Id.* at 934 (emphasis added). Here, the Court asked for time estimates from the parties, expressly indicating that the Court would "make that the limit, and I'll hold you to that." (03-10-05 Tr. 20:6-7.) Exergen estimated 12 hours, and Defendants estimated 30 hours. (*See* 06-13-05 Trial Tr. 5:2-6.) During trial, the Court reiterated that it would hold each party to those time limitations. (*See* 06-13-05 Trial Tr. 5:7.) Moreover, the Court made it clear that the presentation of all evidence would be completed by 1:00 p.m. on July 7, 2005 or else there would be a mistrial. (*See* 06-30-05 Trial Tr. 9:6-13; 06-30-05 Trial Tr. 11:20-12:9.)

On the tenth day of trial, however, the parties discussed with the Court that there were only approximately nine hours remaining of trial time, and that Exergen had only 24 minutes left of its time estimate and Defendants had 22 hours left of their time estimate. (*See* 06-30-05 Trial Tr. 3:13-6:16.) Defendants were willing to do the best they could with the remaining time, even though such time was almost half of what they had requested. (*See* 06-30-05 Trial Tr. 6:14-16.) Defendants requested, however, that Exergen be held to its time limit. (*See* 06-30-05 Trial Tr. 6:14-16; 06-30-05 Trial Tr. 8:23-24.) After Exergen used up its final 24 minutes, Exergen's counsel requested an additional 90 minutes to cross-examine the remaining witnesses. (*See* 06-30-05 Trial Tr. 117:20.) The Court granted Exergen that additional time. (*See* 06-30-05 Trial Tr. 118:18-20.) Defendants respectfully submit that the decision to grant Exergen additional time was erroneous and caused prejudice to Defendants.

Given that the Court was strictly enforcing the amount of remaining time to present evidence, the 90 minutes given to Exergen was taken from Defendants' time. Defendants started with a 30 hour time estimate and had approximately 21 hours remaining at the end of Exergen's case-in-chief. Given that Defendants were required to complete their presentation of all evidence by 1:00 p.m. on July 7, 2005, Defendants were left with approximately 8 hours until the required

"end of trial." Even given this shortened time, Defendants were hopeful that they could finish their presentation. When Exergen was granted an additional 90 minutes, however, those minutes were taken from Defendants' remaining time. Rather than approximately 8 hours, Defendants were then left with only 6 ½ hours. At this point in the trial, Defendants had not presented any of their expert testimony including their damages expert as well as their expert on non-infringement and invalidity. Accordingly, Defendants were required to truncate their presentation of evidence to give more time to Exergen due to Exergen's mismanagement of its time. In particular, Defendants were precluded from presenting certain evidence of non-infringement and invalidity through the testimony of Mr. Goldberg. Such evidence was not and could not have been provided by any other witness since Mr. Goldberg was Defendants' only expert as to those issues.

Defendants timely objected to the allocation of Defendants' time to Exergen. (*See* 07-01-05 Trial Tr. 18:18-19:10.) In addition, Defendants did their best to present as much evidence as possible without exceeding the July 6, 2005 1:00 p.m. time deadline. (*See e.g.*, 07-06-05 Trial Tr. 43:1-22.) However, the allocation of Defendants' time to Exergen truncated Defendants case causing undue prejudice to Defendants and warranting the grant of a new trial.

### 3. The Admission Of Mr. Faris's Testimony Caused Unfair Prejudice To Defendants

A new trial may also be granted where evidence is admitted in error to the prejudice of the losing party. *Lataille*, 754 F.2d at 38. Here, Plaintiff's "damages expert" provided testimony

that failed to meet the requirements of the Federal Rules of Evidence.[5]  Accordingly, Defendants respectfully submit that it was error for the Court to have allowed Mr. Faris to testify at trial as to his opinions.  *See generally, Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 113 S. Ct. 2786 (1993).

Mr. Faris testified that he was asked to calculate the incremental lost profits for Exergen's consumer temporal artery thermometer for calendar year 2001.  (06-27-05 Trial Tr. 8:6-8.)  Mr. Faris admitted at trial, however, that his calculations of average selling price were based on allegedly "consumer" models, (*id.* at 8:16-19), but that he could not confirm they were in fact consumer models, (*id.* at 16:3-17:25).  In addition, Mr. Faris testified that his calculation of overhead was incorrect because it was based on a grossly exaggerated estimate of the number of units and that he would need the actual number of units to correctly calculate overhead.  (*Id.* at 24:6-9, 58:17-20.)  Mr. Faris also made no attempt to supplement his report to use the actual number of units.  During cross examination, Mr. Faris attempted to provide a number, (*id.* at 54:1-25), but such number was not supported by any documentation or numbers that would show whether the number was correct.  In addition, Mr. Faris admitted that the number of lost sales was required to calculate the total amount of lost profits, (06-24-05 Trial Tr. 126:21-127:4), but that he did not provide any opinion as to number of lost sales, (06-27-05 Trial Tr. 37:13-23).  Instead, he simply used the numbers given to him by counsel.  (*Id.* at 37:24-

---

[5] Mr. Faris's expert testimony, report, and deposition testimony were entirely inadequate as set forth in Defendants' Motion *in Limine* No. 6 to Exclude The Testimony of Plaintiff's Damages Expert.  The Court, however, denied Defendants' motion and permitted Mr. Faris to testify.  (06-13-05 Trial Tr. 38:11-16.)  In addition, Defendants renewed their objections to Mr. Faris's testimony during trial.  (06-27-05 Trial Tr. 61:1.)

38:3, 38:18-24, 39:16-21.)   Because Mr. Faris's testimony was based on facts that he has admitted to be insufficient, incorrect, and based on speculation, his testimony should have been excluded.

Because his testimony was improperly admitted thereby prejudicing Defendants, a new trial should be granted.

### 4.    The Admission Of Evidence Regarding The Absence Of A Written Opinion Of Counsel Caused Unfair Prejudice To Defendants

Plaintiff repeatedly pointed out to the jury that the Defendants did not get written opinions as to two of the patents.  (*See, e.g.*, 06-14-05 Trial Tr. 28:1-11.)  The Federal Circuit, sitting *en banc*, expressly held that it is inappropriate to draw an adverse inference from the fact that a defendant has not obtained an opinion of counsel.  *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1345 (Fed. Cir. 2004) (*en banc*).  Plaintiff asked witnesses for CVS whether they any received any legal opinion regarding the patents. (*See* 06-17-05 Trial Tr. 154:4-14; 06-17-05 Trial Tr. 177:24-178:7.)  Plaintiff also asked similar questions of witnesses for Daiwa and SAAT.  However, those witnesses testified that they had obtained written opinions; those opinions, however, did not address the '205 patent. (Trial Exs. 1149; 1151.)  Indeed, there was nothing in the record that at the time of the written opinion, Defendants even knew about the '205 patent.  Nonetheless, Plaintiff expressly urged to the jury to draw an adverse inference from the fact that Defendants' opinion letters did not mention the '205 patent. (07-07-05 Trial Tr. 144:22.)  Defendants unsuccessfully objected to the allowance of evidence as to the absence of written opinions.  Accordingly, because such evidence was allowed, and Plaintiff asked the jury to infer willfulness from the absence of a written opinion, Defendants were unduly prejudiced and should be granted a new trial.

5.    **The Admission Of The Safety 1st Evidence Warrants A New Trial**

The Safety 1st device, brochure, and packaging should not have been admitted as evidence of infringement. (*See* Defs. Mot. in Limine No. 4.) Accordingly, the admission of the Safety 1st evidence was a manifest error of law and caused substantial prejudice to Defendants.

6.    **The Exclusion Of Defendants' Inequitable Conduct Claim Warrants A New Trial**

In September 2002, Defendants requested leave to amend their answer and counterclaim to include inequitable conduct. After the filing of Defendants' previous answer, Defendants had uncovered facts indicating that Exergen, its agents, and/or attorneys committed inequitable conduct before the U.S. Patent and Trademark Office ("PTO") during the prosecution of the patent applications that ultimately issued as the '813 and '685 patents. These facts raised serious questions about the enforceability of the '813 and '685 patents.

Because allegations of inequitable conduct are subject to the enhanced pleading requirements of Federal Rule of Civil Procedure 9(b), a rather thorough investigation of the underlying facts was necessary to enable Defendants to plead the inequitable conduct allegations with sufficient specificity. This investigation took a substantial amount of time due to the rather high number of patents being asserted by Exergen in this case.

The Court denied Defendants' request thereby preventing Defendants from obtain additional discovery on inequitable conduct and raising the issues of inequitable conduct at trial. Accordingly, Defendants request a new trial so that they can present this issue to the jury.

C.    **The Verdict Is Against The Weight Of Evidence**

A court may order a new trial if the jury's verdict is against the clear or great weight of the credible evidence or results in a blatant miscarriage of justice. *Kearns v. Keystone Shipping*

-23-

*Co.,* 863 F.2d 177, 181 (1st Cir. 1988) (citations omitted). In reviewing the evidentiary record to determine whether a new trial should be ordered, the Court is not required to view the evidence in the light most favorable to the verdict-winner. *See* 11 C. Wright, Miller, & Kane, Federal Practice and Procedure: Civil 2d § 2806 (1995). Moreover, this Court may order a new trial even where the verdict is supported by substantial evidence. *Lama v. Borras,* 16 F.3d 473, 477 (1st Cir. 1994) (collecting cases). The district court, "has the power and duty to order a new trial whenever, in its judgment, the action is required in order to prevent injustice." *Id.* (citation omitted).

The jury's verdict on the issue of infringement is against the clear weight of the evidence. Defendants address how the weight of the evidence compels a verdict for Defendants as discussed in Defendants' renewed motions for JMOL related to infringement. (*See, e.g.,* Mem. in Support of Defs.' Renewed Mot. for J. as a Matter of Law that Defs. Do Not Infringe the '813, '205, and '685 Patents as to the Safety 1st Device, the CVS Device, and the ThermoTek Device; Mem. in Support of Defs.' Renewed Mot. for J. as a Matter of Law that Def. SAAT Does Not Infringe the '813, '205, and '685 Patents.)

The jury's verdict on the issue of willfulness is also against the clear weight of the evidence. Defendants address how the weight of the evidence compels a verdict for Defendants as discussed in Defendants' renewed motion for JMOL related to willfulness. (*See* Mem. in Support of Defs.' Renewed Mot. for J. as a Matter of Law that Defs. Did Not Willfully Infringe the Patents.)

The jury's verdict on the issue of damages is likewise against the clear weight of the evidence. Defendants address how the weight of the evidence compels a verdict for Defendants as discussed in Defendants' renewed motions for JMOL related to damages. (*See* Mem. in

Support of Defs.' Renewed Mot. for J. as a Matter of Law that Pl. Is Not Entitled To Lost Profit

Damages and Defs.' Renewed Mot. for J. as a Matter of Law that Pl. Is Not Entitled To Damages

from Def. CVS.)

Moreover, the jury's verdict on the issue of invalidity is against clear weight of the

evidence. Defendants have shown how the great weight of the credible evidence evidences that

the Claim 7 of the '813, Claims 1 through 5 of the '205, and Claims 1, 2, 4, 7, 12-14, 17, 20-23,

and 26-30 of the '685 patent are invalid as set forth in Defs.' Opp'n to Pl.'s Mot. for JMOL that

Defs. Have Failed to Prove that Any Patent Claim is Invalid as well as in Defs.' Mem. in Support

of Defs.' Renewed Mot. for J. as a Matter of Law that Claims 1-5 of the '205 Patent Are Invalid

As Anticipated by the O'Hara Patent.

Accordingly, this Court should order a new trial as to the issues of infringement,

willfulness, damages, and invalidity.

## D.    <u>The Jury's Verdict Was Excessive</u>

This Court should also grant a new trial because the damages awarded by the jury were

excessive. *Conjugal P'Ship,* 22 F.3d at 397 (affirming district court's finding that jury's

damages verdict was infested with errors). A new trial is warranted because the jury verdict

exceeds "any rational appraisal or estimate of the damages that could be based on the evidence

before the jury." *Anthony v. G.M.D. Airline Services, Inc.,* 17 F.3d 490, 493 (1st Cir. 1994)

(citation omitted). Because there is an upper limit to any damages amount, "whether that has

been surpassed is not a question of fact with respect to which reasonable men may differ, but a

question of law." *Id.* (citations omitted).

Courts routinely find that a jury's damages verdict is excessive. For example, a jury's

verdict is excessive where the damages verdict cannot be reconciled with the evidence presented

at trial. *Anthony v. G.M.D. Airline Services, Inc.*, 17 F.3d 490, 495 (1st Cir. 1994) (collecting

cases); *Koster v. Trans World Airlines, Inc.*, 181 F.3d 24, 36 (1st Cir. 1999). Similarly, a jury's

verdict is excessive where the damages verdict is disproportionate to the injury suffered.

*See Laaperi v. Sears, Roebuck & Co*, 787 F.2d 726, 735-36 (1st Cir. 1986); *Marchant v. Dayton*

*Tire & Rubber Co.*, 836 F.2d 695, 704 (1st Cir. 1988).

Courts have also granted a new trial based on an excessive damages verdict in patent

cases. For example, the Federal Circuit has held that a district court abused it discretion by not

ordering a new trial where the damages verdict was grossly excessive. *Shockley v. Arcan, Inc.*,

248 F.3d 1349, 1362 (Fed. Cir. 2001). In *Shockley*, the damages verdict was erroneously based

on assumptions about the number of sales to be taken into account in a lost profits analysis. *Id.*

Similarly, the Federal Circuit has also held that a damages verdict is excessive where the

evidence of lost profits was based upon gross extrapolation and vague estimation. *Oiness v.*

*Walgreen Co.*, 88 F.3d 1025, 1029-030 (Fed. Cir. 1996). Finally, the Federal Circuit has held

that a trial court abused its discretion by failing to grant a new trial on damages where the

damages verdict was greater than the amount encompassed by the evidentiary record at trial.

*Unisplay, S.A. v. American Elec. Sign. Co.*, 69 F.3d 512, 518-519 (Fed. Cir. 1995). *See also*

*IPPV Enters, LLC v. Echostar Commc'ns Corp.*, 191 F. Supp. 2d 530, 566-572 (D. Del. 2002)

(finding a damages verdict amount excessive because it was based on counsel's closing

argument figures and outside of either expert's testimony).

1.  **Plaintiff Failed To Provide Any Evidence Of Lost Sales In 2001**

At trial, Plaintiff was required to show a reasonable probability that he would have made

the asserted sales 'but for' the infringement." *Grain Processing Corp. v. American Maize-*

*Products Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999). Plaintiff, instead, offered no evidence as to

how many of Defendants' sales Exergen would have made. Plaintiff's damages expert, Mr. Faris, admitted that he had done no such analysis. (06-27-05 Trial Tr. 37:13-23.) No witness provided testimony as to the number of sales Plaintiff lost.

Moreover, Plaintiff's expert as to substitutes, Marybeth Pompei, admitted that there were many other available products available to the consumer. (06-28-05 Trial Tr. 28:1-12, 28:24-29:9.) This means that at least some of the Defendants' sales would not have been made by Exergen, but by the companies selling those other products. This admission shows that the number of Exergen's alleged lost sales was:

$$\begin{array}{ccccc} \text{Total Number} & & \text{UNKNOWN} & & \\ \text{of Defendants'} & - & \text{Number of Sales to} & = & \text{???} \\ \text{Sales} & & \text{Other Companies} & & \end{array}$$

Plaintiff also admitted that its product was not approved by the FDA until July 12, 2001 (Trial Ex. 2604) and that Plaintiff would not have shipped the product until it had received FDA approval (06-29-05 Trial Tr. 42:21-22). Thus, Plaintiff conceded that any sales made by Defendants before July 12, 2001 would not have been included in the number of "lost sales" in 2001. Plaintiff failed, however, to provide the number of Defendants' sales that were made after Exergen received FDA approval thereby creating additional uncertainty as to the number of lost sales.

$$\begin{array}{ccccccc} \text{Total Number of} & & \text{UNKNOWN} & & \text{UNKNOWN} & & \\ \text{Defendants} & - & \text{Number of Sales to} & - & \text{Number of Sales} & = & \text{???} \\ \text{Sales} & & \text{Other Companies} & & \text{Before July 12, 2001} & & \end{array}$$

Because Exergen was required to present a number of "lost sales" in 2001, and failed to do so, the only damages award supported by the record lost sales in 2001 is zero (0) making the lost profits amount $0. Accordingly, the jury's verdict was exceedingly excessive and was based upon gross extrapolation and vague estimation thereby warranting a new trial.

**2.**    **The Jury's Verdict Was Based On Speculation**

It is a fundamental principle of lost profit damages that evidence of lost profits cannot be speculative. *Oiness v. Walgreen Co.,* 88 F.3d 1025 (Fed. Cir. 1996). Here, the jury's damage verdict found no basis in the record and could not be reconciled with any of the evidence presented at trial.

First, Plaintiff was only allowed to present evidence of lost profits as to the year 2001. (06-13-05 Trial Tr. at 20:2-3; (MS. HARVEY: "I agree he cannot express opinions regarding lost profits beyond 2001."); *id.* at 20:8-11 ("THE COURT: Okay. With respect to the motion *in limine* number three, the parties are agreed, as I understand it, the witness may not offer any opinion on any lost profits after 2001.).) Plaintiff presented its calculation of lost profits through Mr. Faris, and Mr. Faris testified that lost profits should be calculated as follows:

|  | Assumed Lost Sales in 2001 |  | Incremental Profit |  | Alleged Lost Profits |
|---|---|---|---|---|---|
| SAAT: | 84,672 | * | $29.79 | = | $2,522,378 |
| Daiwa: | 55,836 | * | $29.79 | = | $1,663,354 |
| CVS: | 17,088 | * | $29.79 | = | $ 509,051 |

(*See* Trial Ex. 149.)[6] In closing, however, Plaintiff conceded that while SAAT sold 84,000 units in 2001, SAAT was not liable "for more than the sales that Daiwa actually made in 2001." (07-07-05 Trial Tr. 151:15-20.) Thus, Plaintiff's number of units for SAAT is incorrect and leaves in question the number of units at issue for Daiwa and CVS.

---

[6] As set forth in detail in Defs.' Mem. in Support of Defs.' Mot. for Renewed JMOL that Pl. is Not Entitled to Lost Profits, Plaintiff failed to show lost profits. For example, Mr. Faris provided no opinion as to the number of lost sales. (06-24-05 Trial Tr. at 37:13-23.) There was no evidence as to the number of sales that Plaintiff allegedly lost to each Defendant.

In addition, the number for CVS was entirely incorrect. The number of units CVS purchased in 2001 was 17,088. (07-01-05 Trial Tr. 65:19-23.) The number of units CVS sold was only 30. (07-01-05 Trial Tr. 65:19-23.) Damages for lost profits is based on units sold by an alleged infringer that the patentee contends he would have made, but for the alleged infringer. *Grain Processing*, 185 F.3d at 1349. Moreover, acts of infringement do not include the "purchase" of an infringing product. *See* 35 U.S.C. § 271. Because the total number of sales by CVS in 2001 was 30, Exergen's number of 17,088 is clearly wrong. Exergen provided no evidence, however, as to how many of those 30 units Exergen alleges it would have sold, but for CVS's alleged infringing activities. Even if Exergen had presented evidence that it would have made 100% of the sales of CVS in 2001, which it did not, the maximum allowable recovery would have been for 30 units.

Given that Exergen's own numbers were unsupported and incorrect, it is not surprising that the jury's damage award was speculative and was against the clear weight of the evidence. The jury verdict was as follows:

| | Lost Sales in 2001 | | Incremental Profit | | Alleged Lost Profits |
|---|---|---|---|---|---|
| SAAT: | 52,482 | * | $29.79 | = | $1,563,438 |
| Daiwa: | 23,646 | * | $29.79 | = | $ 704,414 |
| CVS: | 8,544 | * | $29.79 | = | $ 254,526 |

(Signed Jury Verdict Form at 3.) The number of lost sales are not supported by any evidence presented at trial and thus are speculative and arbitrary. Moreover, the number of lost sales for CVS far surpasses the total number of CVS sales in 2001 of 30. The inconsistencies between the evidence presented, the amounts alleged by Exergen, and the jury's verdict makes it impossible for the Court to fix the verdict thereby warranting the need for a new trial.

Finally, this is not a case where the jury's excessive damages award can be cured by remittitur.[7]  Here, the excessiveness of the damages award resulted from jury passion and prejudice that affected the liability verdict and can only be cured by a new trial.  *See Anthony v. G.M.D. Airline Services, Inc.*, 17 F.3d 490, 495 (1st Cir. 1994).  Given the admission of the indemnity insurance as well as the misconduct by Plaintiff's counsel, the prejudice against Defendants seems abundantly clear in the jury's arbitrary damages verdict such that Defendants should be granted a new trial.

### 3.    Plaintiff's Counsel's Closing Argument  Provided Inaccurate And Prejudicial Information

Counsel's factually inaccurate description of damages in closing argument is an additional basis for a new trial.  *Bookland of Maine v. Baker, Newman & Noyes, LLC*, 271 F. Supp. 2d 324, 329-330 (D. Me. 2003).  Importantly, such comments during closing are not cured by a judge's general instructions about closing arguments not being evidence and not

---

[7] As set forth above, because of the abject lack of evidence supporting the damages verdict, Defendants do not believe that remittitur is appropriate, and requests that this Court grant JMOL of no lost profits or a new trial.  The evidence against CVS, however, raises a unique issue.  It was undisputed at trial that CVS sold only 30 of Defendants' thermometers in 2001.  Thus, even applying Mr. Faris' inflated and unsupported incremental profit per unit calculation of $29.79 per unit, the maximum amount of damages against CVS is $893.70.  Yet, the jury awarded damages against CVS in the amount of $254,526 -- an amount 251 times higher than even Mr. Faris' incremental profit per unit figure would support.  Accordingly, if the Court denies Defendants' JMOL of no lost profits and Defendants' request for a new trial, Defendants  request remittitur for CVS  of an amount no greater than $893.70.

overriding jury instructions. *Id.* at n.14. *See also Warner v. Rossignol*, 538 F.2d 910, 912 (1st Cir. 1976) (granting a new trial where district court's curative instruction did not outweigh prejudicial effects of counsel's speculation during closing regarding plaintiff's injuries).

As set forth above, Exergen's closing statement was riddled with false and misleading statements about its damages case. Accordingly, the pervasiveness of such falsities could not have been cured by the Court's instruction to ignore certain portions of Exergen's closing statement and the Court's general instruction regarding closing arguments. Thus, a new trial should be granted.

**E.    A New Trial Is Necessary Due To The Improper Conduct That Affected The Jury**

This Court should also grant a new trial because the improper conduct at trial negatively affected the jury. For example, a new trial may be granted if it was reasonable probable that the verdict was influenced by misconduct by counsel at trial. *A-Cal Copiers, Inc. v. North American Van Lines, Inc.*, 180 F.R.D. 183, 188 (D. Mass. 1998.) The conduct during trial, as set forth in detail above, was highly prejudicial to Defendants such that there is no question that the jury was negatively affected. The jury was subject to many prejudicial issues, including Plaintiff's counsel's false and misleading statements during closing, relentless questioning as to Defendants' indemnity insurance, repeated emphasis on the absence of a written opinion of counsel, and emphatic attempts to have the jury disregard the Court's claim construction. Accordingly, a new trial should be granted.

**F.    A New Trial On All Issues Is Necessary If This Court Grants Defendants A New Trial On Any Issue**

Under Fed. R. Civ. P. 59(a), this Court may grant a new trial on "all or part of the issues" previously decided in a jury trial. *See also Rivera Castillo v. Autokirey, Inc.*, 379 F.3d 4, 15

(1st Cir. 2004). A partial new trial is proper only if, "it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 500, 51 S. Ct. 513, 515, 75 L. Ed. 1188, 1191 (1931). Thus, a new trial should be given on all issues unless "it is plain that the error which has crept into one element of the verdict did not in any way affect the determination of any other issue." *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 454-55 (3d Cir. 2001) (citations omitted). Here, the issues in this case are deeply intertwined and it is impossible to isolate one issue from others, such as willfulness or damages. Moreover, the references to the indemnity agreement and insurance policy affected the jury's entire verdict and view of all evidence after indemnity evidence was admitted.

> Exposing juries to such [insurance] information is condemned because it is not itself probative of any relevant proposition and is taken to lead to undeserved verdicts for plaintiffs and exaggerated awards which jurors will readily load on faceless insurance companies supposedly paid for taking the risk.

*Shore v. Shore*, 385 Mass. 529, 531 (1982). Similarly, Exergen's misstatements about certain claim terms, in opposite to the Court's claim construction, also affected all issues of infringement and invalidity (since such analyses are predicated upon the same claim terms). Similarly, Exergen's fabrications as to willfulness and damages greatly affected the entire trial. Accordingly, because there is no issue, so distinct and separable from the others, which could be retried alone without injustice, a new trial should be given on all issues.

### III. DEFENDANTS REQUEST A NEW TRIAL ON SPECIFIC ISSUES

If the Court decides to deny Defendants' request for a new trial on all issues, Defendants, in the alternative, ask this Court to grant a new trial as to the specific issues of infringement, willfulness, damages, and/or invalidity.

Respectfully submitted,

Dated: August 18, 2005

By: /s/ Mary B. Murrane
     Joseph L. Kociubes (BBO #276360)
     Mary B. Murrane (BBO #644448)
     BINGHAM McCUTCHEN, LLP
     150 Federal Street
     Boston, Massachusetts 02110
     Telephone: (617) 951-8000
     Facsimile: (617) 951-8736

     James B. Bear (admitted *pro hac vice*)
     Michael K. Friedland (admitted *pro hac vice*)
     Amy C. Christensen (admitted *pro hac vice*)
     KNOBBE, MARTENS, OLSON & BEAR LLP
     2040 Main Street, 14th Floor
     Irvine, CA 92614
     Telephone: (949) 760-0404
     Facsimile: (949) 760-9502

     Attorneys for Defendants
     S.A.A.T. Systems Application of Advanced
     Technology, Ltd.,
     Daiwa Products, Inc., and
     CVS Corporation

1818235://jm3/pw4
081705

-33-